**In re Arlene BENFORD, Debtor.**

**Bankruptcy No. 38001155.**

United States Bankruptcy Court, W. D. Kentucky.

Sept. 21, 1981.

Henry K. Jarrett, Louisville, Ky., for debtor.

David T. Stosberg, Louisville, Ky., for 1st National Bank of Louisville.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

At issue is whether a secured creditor paid through a Chapter 13 plan is entitled to interest on its allowed claim, and if so at what rate. The secured creditor, The First National Bank of Louisville, has a security interest in the debtor's 1979 Chevrolet Monte Carlo on which the outstanding loan balance is $6,626.60. The loan payoff at the time of filing, which the bank in its brief asserted was also the fair market value of the car, was $5,654.89. A court appointed appraiser, however, fixed the car's value at $5,225.00, and that was the amount we fixed for the secured claim in confirming the plan.

Before we begin our analysis of the principal questions in this case, we first need to resolve a question regarding that portion of the bank's claim which is unsecured. The confirmation provides that the bank is secured to the extent of $5,225.00 and unsecured to the extent of $1,401.60. The unsecured portion of the claim should instead be $429.89, the difference of $5,225.00 and the allowed claim, exclusive of unmatured interest, of $5,654.89.

The original figure for the unsecured amount is incorrect because it includes unmatured interest amounting to $971.71.

Pursuant to Section 502(b)(2), if objected to, unmatured interest is excluded from an allowed claim.

■ Benford also questions in her brief the value of $5,225 placed on the secured car. To some degree, she concedes the answer to the threshold question in this case—that the bank should be permitted to recover an amount equal to the car's present value if the present value is paid over time.

But Benford contends that $5,225 exceeds the worth of the car; that $5,225 is the fair market value instead of the liquidation value—the value Benford claims should be used—and that the excessive value placed on the car compensates the bank for receiving payments over time on its claim. We reject this argument.

The car's value of $5,225 was arrived at by an independent, court-appointed appraiser. No valuation hearing was requested and none was held. No one objected to the appraiser's estimate and no alternative value was proposed. Further, nowhere in the appraisal is it indicated that the value arrived at was the fair market value or that the liquidation value was not taken into account; the debtor merely makes that assumption.

We therefore accept as an accurate estimate of the car's worth the appraisal of $5,225, but do so without making any judgment on whether that figure is the fair market value, liquidation value, or a combination of the two. We reserve the question of what is the appropriate valuation method for a time when it is raised in the proper procedural framework. Accordingly, we cannot say that the car is overvalued, and, as the debtor suggests, that the overvaluation compensates the bank for receiving the car's present value in the future.

■ With all supplemental questions aside, we come now to the crucial questions in this case—whether the bank is entitled to interest on its claim and if so at what rate.

The question of interest on Chapter 13 secured claims arises out of the requirement of Section 1325(a)(5)(B)(ii) that a court confirm a plan only if,

> with respect to each allowed secured claim provided for by the plan . . . the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim;
>
> . . .

The problem results when the value of a claim "as of the effective date of the plan" is paid through the plan over a period of time. One need not possess a great deal of business and financial acumen to appreciate that a dollar today is worth more than a dollar tomorrow. More appropriately, $5,225 is worth more today than it will be in the future, or, stated in the obverse, $5,225 paid next year is worth less than $5,225 paid today.

To account for the obvious economic shortfall to the secured creditor paid over time, an incremental adjustment needs to be made. Courts without exception have concluded that the best way to provide a secured creditor paid over time with the equivalent of "the value, as of the effective date of the plan" of a claim is to fix an appropriate interest rate on the claim over the course of the payment period. We agree.

Awarding interest is the simplest and most straightforward method of providing for the present value equivalent of a claim.[1] We specifically reject the debtor's implicit suggestion that the future equivalent of a claim's present value can be provided by inflating the value of the secured property. It would be much more certain to work with an established interest rate, whatever it might be, than to fictitiously increase every secured claim at the time it is valued.

The difficulty, as reflected by the divergence of opinion on this issue, is in determining what rate of interest best reflects the present value equivalent of a claim paid over time.

We have examined all of the relevant case law in the area and find unsatisfactory

---

1. 5 *Collier on Bankruptcy*, ¶ 1325.01(3)(b)(ii) at 1325–26 (15th Ed. 1979).

all of the methods for determining interest used thus far. The rates courts have set have ranged from 9%[2] to a 25.98% annual percentage rate.[3] However, the interest rates applied are not nearly as important as the method used to arrive at them. What is of paramount importance is that the rate be reasonably responsive to current economic conditions.

We therefore concur with the spirit of the statement made by a district court in overruling a bankruptcy court's allowance of a 10% rate of interest, "The rate established in *In re Lum* [of 10%] in 1979 is simply inadequate and unreasonable in 1980 and 1981 ..."[4]

In that case, *Memphis Bank & Trust Company v. Walker*, the Court concluded that the contract rate of 15.98%, which approximated the average prime interest rate for the previous two years, was most suitable, in light of all equities, to compensate the bank for not receiving the value of its secured claim immediately.

Other courts have also employed the contract rate approach for providing a present value equivalent.[5] They have relied in part on the legislative history of Section 502(b), the provision that disallows unmatured interest on a claim. That legislative history states a presumption that the "discount rate", a term courts have used interchangeably with the phrase "present value equivalent", is equivalent to the contract rate.

We note, however, that because this presumption is provided in the context of the allowability of claims, its applicability to this type of case, where present value needs to be maintained over time, may be somewhat limited.

The touchstone of providing present value of a claim to be paid in the future is responsiveness to current market conditions. A rule that the contract rate applies would lack such responsiveness. For instance, if a plan were confirmed today, an installment contract entered into by the debtor two years ago would likely contain an interest rate below the present market rate. Conversely, the interest provided in an installment contract entered into today would probably not accurately reflect market conditions two years from now.

We also reject the notion any *any* fixed rate, be it 10%, 20% or 30%, will suffice. Accordingly, we choose not to follow the lead of those cases which use the legal interest rate established by state law to either set the interest rate[6] or extrapolate a rate by averaging the legal rate with other variables.[7] The legal rate in Kentucky is 8%,[8] and can hardly be considered sufficient in light of the current economic situation.

We likewise reject the Internal Revenue rate of 12%, although the Court in *In re Ziegler*[9] considered it "responsive to current economic conditions, ... subject to periodic revisions, yet ... not an unfair burden on Chapter 13 debtors".[10]

The search for an appropriate interest rate—the Holy Grail in Chapter 13 "cramdown"[11]—has also led to the use of the rate

**2.** *In re Crockett*, 3 B.R. 365 (Bkrtcy.N.D.Ill. 1980).

**3.** *In re Cooper*, 11 B.R. 391 (Bkrtcy.N.D.Ga. 1981).

**4.** *Memphis State Bank & Trust Co. v. Walker*, 14 B.R. 264, 7 B.C.D. 1054 (Bkrtcy.W.D.Tenn. 1981).

**5.** *In re Rogers*, 6 B.R. 472, 6 B.C.D. 1214 (Bkrtcy.S.D.Iowa 1980); *In re Smith*, 4 B.R. 12, 6 B.C.D. 424 (Bkrtcy.E.D.N.Y.1980).

**6.** *In re Crockett*, supra n. 2.

**7.** *In re Klein*, 10 B.R. 657, 7 B.C.D. 671 (Bkrtcy. E.D.N.Y.1981); *In re Hyden*, 10 B.R. 21 (Bkrtcy.S.D.Ohio 1980).

**8.** KRS 360.040.

**9.** 6 B.R. 3, 6 B.C.D. 194 (Bkrtcy.S.D.Ohio 1980).

**10.** Id. at 196.

**11.** In Bankruptcy vernacular, Chapter 13 cramdown refers to the repayment of a secured obligation in the amount of the allowed claim, forced by the debtor on the holder of the secured claim. The debtor's use of the "cramdown" prevents the holder of a secured claim from recovering its security.

on three-month U. S. Treasury Bills;[12] the average of the contract rate and the prevailing rate charged by credit unions at the time of cram-down (the effective date of the plan);[13] and the interest rate the secured creditor was charging borrowers of a class similar to the debtor at the time of the cram-down.[14]

All of these methods, though reasonably responsive to the vicissitudes of the economic market-place, are wanting in some respect. We question, for instance, how truly reflective the Treasury Bill method is of the cost of consumer lending. Using the affected creditor's prevailing interest rate would result in a debtor being charged disparate interest rates depending on the secured creditor, and thus sacrifice consistency for the sake of flexibility. And finally, we see no reason to dilute the surest indicator of the cost of consumer finance—the prevailing market rate—by averaging it with the contract rate.

After careful consideration of all of the interest methods employed thus far, we prefer using the prevailing market rate for consumer loan contracts on the date the plan becomes effective.

This method is most responsive to changing economic conditions, yet provides each debtor and secured creditor with a reasonably certain and uniform method for calculating the long-term equivalent of a claim's present value.

Chapter 11 cram-down presents problems identical to those posed in Chapter 13. Deferred payments are required to have a value as of the effective date of the plan equal to the allowed claim. In its discussion on Chapter 11 cram-down and providing present-value equivalent, *Collier on Bankruptcy* writes:

It is submitted that deferred payment of an obligation under a plan is a coerced loan and the rate of return with respect to such loan must correspond to the rate which would be charged or obtained by the creditor making a loan to a third party with similar terms, duration, collateral, and risk. It is therefore submitted that the appropriate discount rate must be determined by reference to the "market" interest rate.

. . . .

The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.[15]

The market interest rate is the product of supply and demand, and is influenced by the prime rate, discount rate, commercial paper rate, Treasury Bill rate and so on. It therefore reflects the interaction of economic variables that affect the cost of lending money. In that sense it is the most accurate indicator of the present value of deferred payments.

We intend to apply the market interest rate for consumer loans across the board, so on any given day on which more than one plan is confirmed the rate will be the same on all secured claims for all debtors. Unlike what could result if we used the rate the individual creditor was charging, the debtor would not be subjected to widely varying, and in many instances extremely burdensome, interest rates.

Although the method we use may seem to favor the creditor at the debtor's expense,

**12.** *In re Willis,* 6 B.R. 555 (Bkrtcy.N.D.Ill.1980).

**13.** *In re Kibler,* 8 B.R. 957 (Bkrtcy.D.Haw. 1981).

**14.** *In re Cooper,* 11 B.R. 391 (Bkrtcy.N.D.Ga. 1981).

**15.** 5 *Collier on Bankruptcy,* ¶ 1129.03 at 1129–62 to 1129–65 (15th Ed. 1979). This discussion was cited and relied upon in *In re Landmark At*

*Plaza Park,* 7 B.R. 653, 6 B.C.D. 1312, 1314 (Bkrtcy.D.N.J.1980), in which a Chapter 11 debtor that provided in its plan for the repayment of a mortgage debt was required to repay the debt at the mortgage market interest rate. The debtor proposed interest of 12.5%, but the court, relying solely on the prevailing market rate of interest for mortgage loans, required payment of interest at 15%.

we observe that *any* method of providing interest is creditor-oriented. Any attempt to award interest is done to put the creditor in as good a position as it would have been had the present value of its claim been paid immediately. The mandate of Section 1325(a)(5)(B)(ii) requires no less. The statute reads "value, as of the effective date of the plan"; it does not read "value, as of the effective date of plan, but subject to reduction depending on the debtor's ability to pay". On this issue, we must read the statute literally.

We agree with the debtor that the creditor is not entitled to the benefit of its bargain. That is not the purpose of these interest payments. In this case, however, the creditor will in fact receive more than what it initially bargained for; in future cases it may very well receive less.

We therefore conclude that the First National Bank of Louisville is entitled to interest on its secured claim at the market interest rate for consumer loans on the date the plan became effective. We further conclude that the effective date of the plan is the date on which it was confirmed, July 31, 1980. This is the date on which the status of the parties became fixed for purposes of Chapter 13.

The bank shall have 30 days within which to present proof of the market interest rate on consumer loans on July 31, 1980.

Upon the foregoing reasoning and authorities,

IT IS HEREBY ORDERED that the Chapter 13 plan of Arlene Benford be modified to provide interest payments to the First National Bank of Louisville at the market interest rate on consumer loans to be payable from July 31, 1980.

IT IS FURTHER ORDERED that those pending cases in which the issue herein is identical be disposed of in accordance with this final order.