| | Roofing Journeymen | Kettlemen | Roofing Helpers | Health & Welfare | Pension | Apprentice Fund |
|---|---|---|---|---|---|---|
| 10–1–81 | 10.40 | 7.25 | 5.90 | .50 | .20 | .03 |
| 4–1–82 | | 7.65 | | .50 | .20 | .03 |
| 10–1–82 | 11.40 | 8.05 | 6.50 | .50 | .20 | .03 |
| 4–1–83 | 11.80 | 8.45 | 6.80 | .50 | .20 | .03 |

## APPENDIX

### LOCAL 254 AGREEMENT

| | Wage | Health & Welfare | Pension | Appr. Fund |
|---|---|---|---|---|
| **August 1, 1981** | | | | |
| Foremen | $10.75 | .40 | .25 | .05 |
| Journeymen | 10.00 | .40 | .25 | .05 |
| Kettlemen | 8.55 | .40 | .25 | .05 |
| Helpers & Tile Tenders | 7.90 | .40 | .25 | .05 |
| **February 1, 1982** | | | | |
| Foremen | $11.25 | .45 | .25 | .10 |
| Journeymen | 10.50 | .45 | .25 | .10 |
| Kettlemen | 9.05 | .45 | .25 | .10 |
| Helpers & Tile Tenders | 8.40 | .45 | .25 | .10 |
| Foremen | $11.75 | .45 | .35 | .10 |
| Journeymen | 11.00 | .45 | .35 | .10 |
| Kettlemen | 9.55 | .45 | .35 | .10 |
| Helpers & Tile Tenders | 8.90 | .45 | .35 | .10 |
| **February 1, 1983** | | | | |
| Foremen | $12.25 | .45 | .45 | .10 |
| *Journeymen* | 11.50 | .45 | .45 | .10 |
| Kettlemen | 10.05 | .45 | .45 | .10 |
| Helpers & Tile Tenders | 9.40 | .45 | .45 | .10 |

Pitch Pay – Employees will receive Seventy-five (75) cents per hour above regular wage rate, except for Kettlemen which will receive One Dollar and Fifty Cents ($1.50) above their regular rate in accordance with Article V, Section 12.

**In re Ramanlal D. PATEL and Balvant V. Patel, d/b/a Jax American Motel, Debtors.**

**Bankruptcy No. 81–521–BK–J–GP.**

United States Bankruptcy Court, M. D. Florida, Jacksonville Division.

May 20, 1982.

Marshall W. Liptak, David L. Fleming, Jacksonville, Fla., for creditors.

## MEMORANDUM OPINION

GEORGE L. PROCTOR, Bankruptcy Judge.

THIS CAUSE came before the Court for a continued confirmation hearing on the Amended Plan of Arrangement, as modified, proposed by the debtor, and upon debtor's request for confirmation of the plan, notwithstanding the rejection of one of debtor's secured creditors.

### HISTORY OF THIS CASE

Ramanlal D. Patel and Balvant V. Patel formed a partnership, Jax American Motel, the debtor, to purchase a motel in 1979 from one Earl W. Crawford. As part of the purchase price, debtors gave Crawford a "wrap-around" mortgage in the amount of $375,000.00. The terms of the wrap-around required the mortgagee to make all payments of principal and interest on first mortgages on the property held by First Federal Savings and Loan Association, from whom Crawford had purchased the property immediately prior to his sale to debtor. At the time of the purchase, the property was in need of substantial repairs and renovations and Crawford agreed to assist the Patels, who were new to this country and had no established credit relations, to obtain such financing. The wrap-around mortgage specifically provided that up to $65,-000.00 of funds could be borrowed by the Patels and the amounts used to repay those sums could be deducted from the payments on the wrap-around mortgage. When Crawford failed to provide assistance in arranging financing of the renovations, debtor struck an arrangement to deduct $1,000.00 per month directly from the wrap-around mortgage payment to be used in renovations on the property. This arrange-ment continued until September, 1980, the debtor deducting $10,000.00 from the mortgage payments and expending approximately $14,000.00 on various renovations.

After having made the September, 1980 payment to Crawford, the Patels were served with foreclosure proceedings instituted by First Federal and discovered that Crawford had not paid First Federal since May, 1980. Debtor also learned at that time that Crawford had assigned or sold his interest in the wrap-around mortgage to Dew Mortgage Company and Dale E. Witsman. The mortgage foreclosure also affected a truck stop and restaurant which was owned and operated by Crawford and/or his assigns, adjacent to the motel property.

Witsman and Dew Mortgage, having other financial difficulties of their own, commenced Chapter 11 proceedings in the Southern District of Illinois. First Federal filed a complaint in this Court seeking to lift the stay as to the truck stop and motel. The Court lifted the stay as to the truck stop but continued it as to the motel, provided that Dew and/or Witsman made necessary repairs to the roof. First Federal severed the motel from the foreclosure proceedings and completed the foreclosure on the truck stop. When Dew and Witsman failed to make any repairs to the motel property, the stay was terminated, whereupon the debtor instituted this Chapter 11 proceeding.

The debtor's Plan of Arrangement deals substantively with two specific claims, the first mortgage held by First Federal and the wrap-around mortgage held by Dew and Witsman (the Dew/Witsman Chapter 11 proceedings having been converted to Chapter 7, the wrap-around claim is now held by the Chapter 7 trustee). The normal motel trade creditors and numerous unsecured note holders are basically unaffected by the terms of the Plan of Arrangement. After approval of the debtor's disclosure statement an Amended Plan was circulated and received the affirmative acceptance of the unsecured creditors, but was rejected by First Federal and the bankruptcy trustee

for Dew/Witsman. First Federal filed a competing Plan of Arrangement which was also rejected by the bankruptcy trustee.

At the initial confirmation hearing, the Court determined, based upon the evidence presented, that all of the requirements of section 1129(a) of the Bankruptcy Code were satisfied with the exception of paragraph (8). The debtor announced a modification of its plan, the effect of which was to render the treatment of First Federal's claim in the debtor's plan identical to the treatment given it by First Federal's own competing plan. First Federal announced that it would change its vote to accept the debtor's plan with the proposed modification and the debtor requested the Court to confirm its amended plan, as modified, pursuant to 1129(b). The matter is now back before this Court, after due notice, to consider whether to "cram down" the debtor's plan against the non-accepting wrap-around mortgagee.

### TREATMENT OF SECURED CLAIMS

As noted before, the substantive provisions of the plan basically deal with the two secured claims. First Federal holds a first mortgage (actually two first mortgages on two parcels on which the motel buildings are located, but cross-collateralized so that they are treated as one mortgage) having a principal balance of approximately $150,000.00. Added to this are delinquent payments, interest, foreclosure costs, attorneys fees, etc. of an additional $40,000.00, making a total indebtedness to First Federal of approximately $190,000.00. The wrap-around mortgage had a principal balance at the time of foreclosure of approximately $370,000.00, or a $180,000.00 "equity" to the wrap-around mortgagee after deducting the amounts due to First Federal.

The plan provides that First Federal will receive monthly payments of $2,495.00, until the entire indebtedness to First Federal with interest as specified in the plan, is retired. This will require approximately 128 payments or slightly over 10 years. This is the same treatment given by First Federal in its own competing plan, which,

in light of the result herein, has been withdrawn by First Federal.

The plan then provides that the same monthly payment, i.e. $2,495.00, be paid to the wrap-around mortgagee for approximately 243 months, with the proviso that the first 128 payments are to be paid directly by the debtor to First Federal, which is consistent with the duty of the wrap-around mortgagee to pay the underlying mortgage to First Federal and the debtor's right, under the terms of the wrap-around mortgage to cure the wrap-around mortgagee's default and offset the cure against the payments due.

### THE FAIR AND EQUITABLE STANDARD

In order to confirm the debtor's plan with respect to the wrap-around mortgagee, the Court must find that the plan does not discriminate unfairly (which is not a factor in this case) and that the plan is "fair and equitable." Bankruptcy Code section 1129(b)(1). Section 1129(b)(2) then sets forth the requirements which must be satisfied before finding a plan to be fair and equitable with respect to a dissenting class. Since the property is not being sold pursuant to the plan, subsection (A)(ii) is not applicable. To obtain confirmation, the debtor must satisfy the requirements of subsection (A)(i) or (A)(iii). Subsection (A)(i) requires that the holder of the secured claim retain his lien to secure deferred cash payments totaling at least the amount of his claim, which payments must have a present value of at least the value of the claimant's interest in the collateral. A plan may also be confirmed under subsection (A)(iii) if the plan provides for the claimant to receive the "indubitable equivalent" of its claim.

In determining the deferred cash payments to be received by the wrap-around mortgagee, the debtor has taken into account the remaining $55,000.00 in available credit for renovations pursuant to the terms of the mortgage, some of which has already been expended by the debtor during the Chapter 11 proceeding, specifically the

roof and ceiling repairs required by the Court, of approximately $14,000.00, and all of the costs and expenses of defending the foreclosure, prosecuting the Chapter 11 proceeding and the payments required to be made to First Federal to reinstate it after the wrap-around mortgagee's default thereunder. With that in mind, the plan provides for the wrap-around mortgagee to retain its lien to secure 243 payments of $2,495.00 each or a total deferred cash payment of $606,285.00. The Court has no trouble in determining that the total deferred cash payments are at least equal to the amount of the wrap-around claim. Further, after deducting the initial payments to be made to First Federal, the wrap-around claimant will receive net deferred cash payments of $286,925.00. Again, this is more than the net wrap-around claim of $180,000.00.

The Code then requires a determination of the relationship between the value of the collateral and the present value of the deferred cash payments. At the request of the debtor, the Court takes judicial notice of testimony previously given in this Court in the Dew/Witsman Chapter 11 proceeding on First Federal's application for relief from the stay. First Federal's appraiser testified to a value of the motel property of $215,000.00. Dew/Witsman's appraiser valued the property closer to $250,000.00. One of the Patels testified to a value of $225,000.00. The Court also received the written appraisal of M. J. Simon, a professional appraiser who testified at the previous hearings, showing a value of $215,000.00. Debtor concedes that the present value of the property is depressed because the truck stop and restaurant, which were a substantial source of business for the motel, are closed as a result of First Federal's foreclosure and also because the property is still in need of additional renovations. The debtor testified that he anticipated increased revenues when the renovations are completed and when the truck stop and restaurant are reopened for business. Such anticipated future appreciation of property value is the very reason for Congress requiring that the deferred cash payments to be secured by

retention of the mortgage lien be at least the amount of the full mortgage claim. The Court determines, based upon the testimony that the property has value at this time of $225,000.00, less the amount owed to First Federal of $190,000.00, leaving a $35,000.00 equity in the property subject to the wrap-around lien.

The debtor testified that the present value of the *total* deferred payments to the wrap-around mortgagee was $300,000.00, discounted at 8%. The present value at the same discount rate of the net payments (after paying First Federal) is approximately $85,000.00. These figures are clearly in excess of both the gross and net values of the property. According to debtor, the 8% discount rate was used because it is the contract rate specified in the wrap-around mortgagee and was the negotiated rate between the Patels and Crawford, from whom they bought the property. The Court suspects that the inflated price paid for the property by the debtor may also have something to do with the reduced interest rate in the mortgage. Much has been made in the case law of the necessity of determining the exact market discount rate to determine present values in cram down litigation. Many cases dealing with this issue have arisen in the Chapter 13 setting. However, "Chapter 11 cram-down presents problems identical to those posed in Chapter 13. Deferred payments are required to have a value as of the effective date of the plan equal to the allowed claim." *In re Benford,* 14 B.R. 157, 160 (Bkrtcy.W.D.Ky.1981). From examination of numerous Chapter 13 opinions, it has become apparent to this Court that the courts have been confronting this issue in a case-by-case method. See, e.g., *In re Rogers,* 6 B.R. 472 (Bkrtcy.S.D.Ia. 1980), where the annual contract interest rate was determined to be a proper discount rate; *In re Benford,* supra, where the court decided that the prevailing market rate was the proper rate since it was the only rate which could be reasonably responsive to current economic conditions; *In re Klein,* 10 B.R. 657 (Bkrtcy.1981), where the court determined the most equitable rate by aver-

aging the legal rate and the contract rate. This Court believes that where a seller negotiates a fixed rate with a buyer for a purchase money mortgage on a particular piece of property, that rate is far more persuasive than the money market or other sources of financial data. Moreover, in this particular case, Dew and Witsman purchased this mortgage from Crawford with an 8% interest rate in the mortgage and any additional discount desired by Dew-Witsman, would have been reflected in the purchase price paid for the mortgage. Nevertheless, the debtor did testify that the present value of the deferred cash payments to the wrap-around mortgagee discounted at any rate up to and including 15% would still be at least equal to the value of the collateral. In addition, the Court is faced with unusual circumstances of the mortgagee causing the default rather than the mortgagor. Under those circumstances the Court is most persuaded by the contract rate and would not, in any case, find a rate in excess of 15% applicable to this property. For example, the rate proposed by First Federal in its competing plan and ultimately accepted by the debtor in its modification is 11%, with an increase sometime during the life of the mortgage to 13%. This is obviously an indication of the result of arms length negotiation between debtor and First Federal. Accordingly, the Court finds that the present value of the deferred cash payments to the wrap-around mortgagee, as of the effective date of the plan, is at least the value of the wrap-around mortgagee's interest in the motel property.

Finally, notwithstanding the technical requirements of paragraph (2)(A)(i) of Section 1129(b), the Court also believes that the wrap-around creditor, under this plan, is receiving the "indubitible equivalent" of its claim under subsection (2)(A)(iii). In other words, the Court is convinced that considering the wrap-around mortgagee's obligation to satisfy the First mortgage and the debtor's right under the terms of the mortgage to cure the default at the expense of the wrap-around mortgagee, the wrap-around mortgagee is receiving exactly that to which it is equitably entitled.

Accordingly, upon the evidence presented the Court finds that

The Amended Plan, as modified, proposed by the debtor, satisfies the requirements of Section 1129(b) and is fair and equitable as to the secured creditor which has not accepted the plan and a separate Order will be entered confirming the Amended Plan as modified.