In re KULJIS SEAFOOD CO.,
INC., Debtor.

Bankruptcy No. 8407888 SC.

United States Bankruptcy Court,
S.D. Mississippi.

June 6, 1986.

Stephen R. Graben, Asst. U.S. Atty., U.S. Attorney's Office, Biloxi, Miss., for U.S.

Richard Scruggs, P.A., Pascagoula, Miss., for debtor.

## MEMORANDUM OPINION

T. GLOVER ROBERTS, Bankruptcy Judge.

This issue came on before the Court on the Objection to Confirmation of the Debtor's Second Amended Plan of Reorganization filed by the United States of America on behalf of its agency, the Small Business Administration (SBA). No other objections were filed, and the issues were submitted to the Court on briefs. Upon consideration thereof, the Court enters the following Conclusions of Law. The Facts, stipulated by the parties and filed on November 18, 1985, are incorporated herein by reference.

Section 1129(a) of Title 11 of the United States Code provides the requirements which must be met in order to confirm a plan of reorganization. Where a class of creditors has not accepted the plan, as in this case where the class was composed only of the SBA, or where the class is impaired, as is also the case here, under which events Section 1129(a)(8) would not be met, the proponent of the plan may request confirmation under § 1129(b) notwithstanding the requirements of § 1129(a)(8), "cram down", if all other applicable requirements of § 1129(a) and (b) are met. Of these requirements, the SBA contends that § 1129(a)(7)(A)(ii) and § 1129(b)(2)(A) have not been complied with by the debtor.

Subsection (a)(7)(A)(ii) provides that each holder of a claim of such class

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date

. . .

*Id.* The debtor's plan provides that the SBA's claim will be treated as follows:

The allowed claims of the United States Small Business Administration shall be paid as follows: (i) The debtor shall, upon confirmation, resume regular periodic payments as called for in the promissory notes held by SBA and secured by the debtor's property; (ii) the debtor shall, promptly following confirmation, execute and deliver to SBA a new promissory note in a principal amount equal to that portion of SBA's claim that constitutes delinquent interest and collection costs, said note to bear interest at twelve percent (12%) per annun, and to be payable in two (2) equal installments on November 1, 1986 and November 1, 1987: (iii) the payment of all delinquent principal as of the date of confirmation shall be deferred until maturity; and (iv) SBA's liens on the debtor's property shall be retained, and its claims against the debtor and its property shall remain otherwise unimpaired and unaffected by this plan.

*Debtor's Second Amended Plan and Disclosure Statement,* at p. 3. As pointed out by the SBA, the property upon which its loans are collateralized are listed on the debtor's schedules as having an estimated market value of $2,000,000.00, while the principal amount of the SBA's claim is $457,053.05. The allowed distribution of a claim to a secured creditor where the value of the security is greater than the amount of the claim includes charges provided for in the agreement under which the claim arose. 11 U.S.C. § 506(b). Therefore, the SBA would, in the event of liquidation, be entitled to its total claim of $457,053.05 plus contract rates of interest on the appropriate portions of the debt at 3% and at 8¼% per annum, as in the original notes.

The key issue here is in determining whether the amount to be received by the SBA under the plan is property of a value, as of the effective date of the plan,

that is at least as much as the SBA would receive under liquidation as described above. The SBA argues that "the present value of deferred payments to be received under the plan is considerably less than what [the] SBA would receive upon a liquidation of the debtor's assets". *Memorandum of Points and Authorities in Support of Objection to Confirmation of Plan,* at p. 13. The operative language in § 1129(a)(7)(A)(ii) requires that the property to be received by the creditor be determined at a value "as of the effective date of the plan". This same language is tracked in § 1129(b)(2)(A)(i)(II) as the requirement where the creditor is to receive deferred cash payments. Therefore, if it is determined that the requirements for confirmation delineated in § 1129(b)(2)(A)(i)(II) have been met in the debtor's second amended plan, then so will the requirements of § 1129(a)(7)(A)(ii) be met. *See In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 655 (Bankr.D.N.J.1980) Therefore, the Court's focus turns to the concept of present value as a condition for a fair and equitable plan under § 1129(b). Section 1129(b) with respect to secured claims provides:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides

(i)(I) that the holder of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (1) or (iii) of the subparagraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b) [1]

The issue here revolves around § 1129 (b)(2)(A)(i)(II) language tying in the value of deferred cash payments to the effective date of the plan.

"Value as of the effective date of the plan," as used in paragraph ... 1129(b), ... indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan. The discounting should be based only on the unpaid balance of the amount due under the plan, until that amount, including interest, is paid in full. [House Report No. 95–595, 95th Cong., 1st Sess. 408 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6364.]

§ 1124 Legis.Hist., Bankruptcy code, Collier's Pamphlet Edition (1986). Whether the present value of deferred cash is based

---

**1.** Section 1124 provides the circumstances under which a claim is not impaired which includes the curing of a default, as the debtor proposes in its plan here. However, the cure and compensation must be completed by the effective date of the plan to avoid impairment. *In re Jones,* 32 B.R. 951 (Bankr.D.Utah 1983).

Here the default is cured in deferred payments, thus the claim is impaired and the plan may only be confirmed under 1129(b), where the creditor has not accepted the plan. If the creditor's claim were not impaired, no § 1129(b) analysis would be necessary because the plan would be deemed accepted by the creditor.

upon the current market rate of interest or the contract rate is the legal question upon which this Court must focus.

In the case of *In re Nolen*, 50 B.R. 488 (Bankr.W.D.Ark.1985), it was held that the appropriate interest rate is the current market value. There, confirmation of the plan was denied where it was proposed to pay 10 percent per annum while the market rate of interest was 13 percent. The original contract rate of interest was not discussed. The Court cited authority for this holding as follows:

> *Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983); *In re Roxbury Residential Associates, Inc.*, 35 B.R. 348 (Bkrtcy.D.Conn.1983) *In re Snedaker*, 32 B.R. 29 (Bkrtcy.S.D.Fla.1983) *In re Connecticut Aerosols, Inc.*, 31 B.R. 883 (Bkrtcy.D.Conn.1983); *In re Sullivan*, 26 B.R. 677 (Bkrtcy.W.D.N.Y.1982); *Matter of Landmark at Plaza Park Limited*, 7 B.R. 653 (Bkrtcy.D.N.J.1980). *Klee*, "All You Ever Want to Know About Cramdown Under the New Bankruptcy code," 53 *American Bankruptcy Law Journal* pp. 133, 156.

*Id.* at 489 [2] *See also In re N.S. Garrott & Sons*, 48 B.R. 13 (Bankr.E.D.Ark.1984) (confirmation denied where plan proposed interest rate less than current market rate); *In re Benford*, 14 B.R. 157 (Bankr. N.D.Ky.1981).

Other cases have taken a contract rate of interest into consideration in determining the correct rate to be applied under a confirmation analysis. In the case of *In re Victory Construction Company, Inc.*, 42 B.R. 145 (Bankr.C.D.Cf.1984), the market rate of interest from the filing date until confirmation was much higher than the contract rate of interest on the obligation to a creditor who filed a plan competing with that of the debtor. The Court held that the debtor's plan, which provided interest at the contract rate of 8%, met the standards of confirmation, while the creditor plan calling for interest at the purport-ed current market failed. The Court stated that

> The consequence of such a payment, without explicit authorization in the Code, would be to allow the secured creditors to take more than 100 percent of their claims. It is clear that the drafters intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior. *See generally* Senate Report No. 989, 95th Cong., 2d Sess. 127–128 (1978).

*Id.* at 155. Along the same vein, it was noted in *In re Barrington Oaks General Partnership*, 15 B.R. 952 (Bankr.D.Utah 1981), that "the market [value] may also overlook the purpose of Section 1129(b)(2)-(A)(i)(II) to protect creditors from loss rather than to augment their opportunity for profit making under a plan." *Id.* at 964.

Additional cases holding that the contract rate is proper include *In re Naugle's Nursery*, 37 B.R. 574 (Bankr.S.D.Fla.1984) (Court pointed out consideration made to FHA policy in purposes of loanmaking, i.e. —disaster relief) and *In re Rogers*, 6 B.R. 472 (Bankr.S.D.Iowa 1980). In *Rogers*[3], the Court pointed out that

> A determination of a proper discount rate could become a very complex matter. *In re Miller, supra* [4 B.R. 392 (Bkrtcy.S.D.Cal.1980)]. In order to simplify this Congress has suggested that there should be a presumption that a proper discount rate would be the same as the rate set out in the parties' interest bearing Agreement. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352–53 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; S.Rep. No. 95–989, 95th Cong., 1st Sess. 62–63 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

*Id.* at 475. In *In re Patel*, Bkrtcy. 21 B.R. 101 (M.D.Fla.1982) the Court explained its reasoning in determining that the appropriate rate of interest was the contract rate under § 1129(b) was as follows:

---

**2.** Note that *Roxbury, Connecticut Aerosol*, and *Snedeker* deal with deferred tax payments under § 1129(a)(9), however.

**3.** This case involved a Chapter 13 confirmation under § 1325(a)(5)(B)(ii) which incorporates language concerning present value.

Much has been made in the case law of the necessity of determining the exact market discount rate to determine present values in cram down litigation. Many cases dealing with this issue have arisen in the Chapter 13 setting. However, "Chapter 11 cram down presents problems identical to those posed in Chapter 13. Deferred payments are required to have a value as of the effective date of the plan equal to the allowed claim." *In re Benford,* 14 B.R. 157, 160 (Bkrtcy.W.D.Ky.1891). From examination of numerous Chapter 13 opinions, it has become apparent to this Court that the Courts have been confronting this issue in a case-by-case method. See, e.g., *In re Rogers,* 6 B.R. 472 (Bkrtcy.S.D.Ia. 1980), where the annual contract interest rate was determined to be a proper discount rate; *In re Bedford, supra,* where the Court decided that the prevailing market rate was the proper rate since it was the only rate which could be reasonably responsive to current economic conditions; *In re Klein,* 10 B.R. 657 (Bkrtcy. 1981), where the court determined the most equitable rate by averaging the legal rate and the contract rate. This Court believes that where a seller negotiates a fixed rate with a buyer for a purchase money mortgage on a particular piece of property, that rate is far more persuasive than the money market or other sources of financial data.

*Id.* at 104–05. Courts have also been mindful of windfall effects to the debtor or creditor where the market rate post-petition is different from the original contract rate. *See In re Maimone,* 41 B.R. 974 (Bankr.D.N.J.1984); *In re Loveridge Machine & Tool Co., Inc.,* 36 B.R. 159, 163 (Bankr.D.Utah 1983). The Eighth Circuit favored the contract rate where the prevailing market rate was lower, and the creditor was over secured in the case of *In re Monnier Brothers,* 755 F.2d 1336 (8th Cir. 1985).

Courts have also distinguished the present value rate of interest in § 1129(b) from the contract rate in § 506(b). Noting that there is much dispute as to what discount rate should be applied to determine the present value of deferred payments, the Court in *In re Hildreth,* 43 B.R. 721 (Bankr.D.Idaho 1984), summarized that "the creditor is allowed his contract rate until the effective date of the plan under § 506(b); after that date, he is entitled to the present value of his allowed claim at a discount rate under § 1129(b)(2)". *Id.* at 722. *In re Maimone,* 41 B.R. 974 (Bankr. D.N.J.1984) also distinguishes § 506(b) and § 1129(b) in a similar manner. The Legislative History of § 1129 indicates, however, that a plan may be confirmed where the creditor receives property of a value equal to the allowed amount of their claim *as determined under § 506(a).* Comment, Bankruptcy code, Collier's Pamphlet Edition (1986) [H.r. No. 95–595, 95th Cong., 1st Sess. 413–418 (1977)] (emphasis added). *Maimone* further stated that

To determine the proper rate of interest, courts must instead rely on the policy considerations underlying the Bankruptcy Code and commercial law in general.

 Admittedly, these principles do not forcefully compel either the contract rate of interest, a market rate, the legal rate, or any other particular interest rate. In general, however, it is appropriate for oversecured creditors to be allowed the contract rate of interest partly for the reasons stated in *In re Loveridge, supra:* "(R)ejecting the contract rate where there is a contract might mean either a windfall to the creditor when the contract rate is less than the rate selected or a windfall to the debtor when the contract rate exceeds the rate selected ... The parties in this case have shown no good reason for producing a windfall under Section 506(b)." 36 B.R. 159, 11 B.C..D. at 487.

In a reorganization, however, a windfall is inevitable whenever the market discount rate, which becomes effective upon confirmation of a plan of reorganization, differs from the contract rate. *See In re Loveridge, supra* (chapter 11); *In re Busman,* 6 B.C.D. 683, 5 B.R. 332 (Bankr.E.D.N.Y.1980) (chapter 13); Blum. *Treatment of Interest on Debtor Obligations Under the Bankruptcy*

*Code,* 50 U.Chi.L.R. 430, 441 (1983); *but see In re Kauffunger,* 16 B..R. 666, 668–69 (Bankr.D.N.J.1981) (DeVito, J.) (chapter 13; contract rate).

*Id.* at 979. The Court pointed out that the contract rate would generally apply absent equitable considerations. Moreover, "the creditor is not entitled to the benefit of its bargain, that is not the purpose of these interest payments." *In re Benford, supra,* at 161. *See also In re Briggs Transportation,* 780 F.2d 1339 (8th Cir.1985) (benefit of bargain discussed in adequate protection context).

In determining how the legal authorities and policy considerations should be applied under the facts of this case, an initial issue is whether the plan payments proposed by the debtor constitute "deferred cash payments". "Deferred" is defined in Webster's Third New International Dictionary as, "put off", "postponed", or "withheld for or until a stated time." *In re Parker,* 15 B.R. 980 (Bankr.E.D.Tenn.1981), states that all "deferred" means is that cash payments are made after the effective date of the plan and in more than one payment. *Id.* at 982. Under this definition, the payments which the debtor proposed to make to the SBA would all be classified as deferred.

■ However, it is illogical to treat payments, with the exception of delinquencies, as deferred under a plan of reorganization under § 1129(b)(2), thus subjecting them to additional requirements concerning present value of interest, where the section's intent is merely to protect creditor's interests in terms of a potential loss and where the terms of payment are not changed from what they were prior to the Bankruptcy, but are reinstated. Therefore, the portion of the SBA debt that is resumed in regular periodic payments should not be treated as deferred under 1129(b), thus invoking additional standards on a reinstated debt. The payments are not any more "deferred" or "postponed" under the plan than they would have been absent the bankruptcy.

This is consistent with cases that have recognized the notion that deferred payments under § 1129 are in the nature of "coerced" loans. *In re Southern States Motor Inn, supra,* n. 7; *In re Benford, supra,* at 160. Furthermore, "payment of interest at the market rate seems inconsistent with § 1124(2)'s recognition of debtor's right to cure a default and reinstate the contract on its original terms". *In re Shriver,* 33 B.R. 176, 185 (Bankr.N.D.Ohio 1983).[4] This factor distinguishes the debtor's circumstances here from those in cases cited holding that the market rate is the proper rate for interest under a cram-down scenario.

■ Even if the entire debt were treated as a deferred debt for purposes of section 1129(b) increase in payment on the SBA claim from the contract rates of interest to the market rate would act as a windfall to the SBA. They would be receiving more than 100% of their allowed claim under § 506 and more than they ever would have receive, but for the bankruptcy. These effects are pointed out in *American Mariner, Maimone,* and *Loveridge, supra.* For these reasons, the Court finds that the first section of the debtor's plan concerning the SBA calling for a resumption of regular payments under the note meets the standards of § 1129 and that the contract rate of interest, rather than the market rate, is appropriate.

■ Regarding the portion of the debt that is currently past due, the debtor's plan proposes to pay 12% interest upon the delinquent *interest* payments in two annual installments, and further provides that the delinquent principal payments be deferred until maturity. These payments, representing *past due* debt, rather than payment not yet due, would be "deferred" or postponed under the reorganization plan and should be treated as such for purposes of § 1129(b)(2). The SBA, as an oversecured creditor, is entitled to the present value, as of the effective date of the plan, of these "deferred" payments under the

---

**4.** Although the entire debt is not technically cured in the plan since the delinquency payments will not be paid by the effective date of the plan, the fact remains that the remainder of the contract *would* be resumed under its original terms.

language of § 1129(b)(2). *In re Nolen, In re Garrott, supra.* Under this set of circumstances[5], the Court finds that the 12 percent interest rate provided in the debtor's plan sufficiently meets the "present value" standard. However, the amount upon which the present value of interest should be applied is the past due principal, rather than the accumulated interest on the past due principal. Otherwise, the creditor would not receive any interest for whatever period of time would elapse after the last interest payment at 12% were made in November of 1987 and the time at which the debtor pays the principal on the past due amounts.[6] This Court does not consider that the 12% interest on the past due interest alone is the "indubitable equivalent" of the claim under § 1129(b)(2)(A)(iii) under circumstances where there would be a considerable amount of time under which the interest on the past due principal was not being calculated at a current rate of interest. The 12% interest provided by the plan on delinquent interest payments due, however, complies with the rationale, as discussed, *supra*, that interest accumulates at the contract rate until the effective date of reorganization, and at the market rate thereafter. However, the debtor's plan does not consider interest during any possible gap of time, as described above, where no market rate of interest would be paid. For this reason, the Court at this time would deny confirmation of the Debtor's Second Amended Plan of Reorganization. However, the Court would reconsider its ruling if the debtor shows that payment of the deferred delinquent principal amounts is calculated at a present value, or would allow the plan to be amended accordingly.

Counsel for the debtor is instructed to prepare an order in conformation with this opinion.

---

**5.** The concept of value should be flexible under the Bankruptcy Code in order to fashion a remedy appropriate under circumstances set forth in each individual case. *In re Miller,* 4 B.R. 392 (Bankr.S.D.Cf.1980)

**6.** The plan provides that the past due principal will be paid at "maturity". However, to the extent that past due payment have already matured, it is unclear exactly when the debtors plan provides that these payments will be made.