In re AMERICAN PROPERTIES,
INC., Debtor.

AMERICAN PROPERTIES,
INC., Plaintiff,

v.

TOPEKA BANK AND TRUST,
Defendant.

TOPEKA BANK AND TRUST OF TOPE-
KA, Topeka, Kansas; University State
Bank of Lawrence, Kansas; First Na-
tional Bank of Kearney, Nebraska, and
First Westroads Bank of Omaha, Ne-
braska, Plaintiffs,

v.

AMERICAN PROPERTIES,
INC., Defendant.

Bankruptcy No. 80–40156.
Adv. Nos. 80–0141, 80–0142.

United States Bankruptcy Court,
D. Kansas.

Dec. 8, 1980.

Byron C. Loudon, Kansas City, Kan., for debtor.

Larry G. Karns, Topeka, Kan., for Topeka Bank and Trust.

John W. Brand, Jr., Lawrence, Kan., for University State Bank of Lawrence, Kansas.

Jerrold L. Strasheim, Omaha, Neb., for First National Bank of Kearney, Nebraska.

James F. Kasher, Omaha, Neb., for First Westroads Bank of Omaha, Nebraska.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

The above numbered adversary proceedings have been joined for the purpose of this decision as they are interdependent, a decision in one necessarily affects a decision in the other.

Adversary number 80–0141 was initiated on September 10, 1980 by the debtor in possession (debtor) requesting release of insurance proceeds held by the Topeka Bank and Trust of Topeka, Kansas (TBT). The funds are a portion of an insurance settlement paid as a result of fire damage to the debtor's Topeka office and warehouse facility. That premise is mortgaged to TBT and three other banks, University State Bank of Lawrence, Kansas (USB), First National Bank and Trust Company of Kearney, Nebraska (FNB) and First Westroads Bank of Omaha, Nebraska (FWB).

Adversary number 80–0142 was initiated on September 11, 1980 by those four banks seeking relief from the stay imposed by 11 U.S.C. § 362 in order to foreclose or in the alternative adequate protection pursuant to 11 U.S.C. § 361.

The primary issue is whether the debtor is to retain the premises and if so, under what conditions. Secondary issues involve release of the insurance proceeds to the debtor, marshalling as requested by FNB as it affects TBT, estoppel and waiver as it may apply to TBT concerning the fire insurance proceeds and voidable preference between the debtor and FNB.

The issues were formulated at a hearing before the Court on September 22, 1980. The parties have submitted legal memoranda, the last of which was received by the Court on November 3, 1980.

## FINDINGS OF FACT

The real property which is purported to be the collateral of the four banks is owned and occupied by the debtor and is an office and warehouse facility located in Topeka, Kansas. The facility is currently in use by the debtor and the debtor intends to repair and use the premises in its reorganized business.

TBT possesses a first mortgage on the real property dated December 14, 1972. The original note to TBT was in the amount of $120,000 payable in 120 monthly payments of $1,003.80 bearing interest at 8%. The balance on the note is $104,806. TBT holds $37,046.72 in proceeds from the fire loss in a non-interest bearing account with the debtor called "fire loss reserve account." The account had a beginning balance on May 22, 1979 of $52,686.11. Since that time the account has been drawn down to its present balance by payments to Coleman American Moving Service, Shrake Electric, College Hill Plumbing, Ray Anderson, J. Bausch, City of Topeka and Mel Ralston. All of these draws against the account were for improvements to the real property necessitated by the fire damage or for removal of debris caused by the fire. Should the debtor rebuild the damaged portion of the office/warehouse facility, an additional $19,000 in insurance proceeds would be available from the insurance carrier.

The USB possesses a mortgage, junior to TBT, dated January 17, 1978. The original note to USB was in the amount of $90,000 payable at $5,000 per month with the balance due January 17, 1979 bearing interest at 10%. The balance apparently due on the note is $44,815.10.

The FNB possesses a mortgage, junior to USB, dated December 18, 1979. The notes to FNB were in the respective amounts of $126,155.82 bearing interest at 7% and $85,349.81 bearing interest at 10%. The balance due on the notes is $212,435.80. Prior to December 18, 1979 FNB did business with the debtor Coleman Moving Services, Inc. That debtor was indebted to FNB for all but $75,000 of the current debt to FNB. On or about December 18, 1979 American Properties, a sister entity to Coleman Moving Services, Inc., received from FNB $75,000 plus cash or its equivalent in the exact amount of the existing debt of Coleman Moving Services, Inc. to FNB. As security for the loan FNB received for the first time a mortgage on the Topeka realty. American Properties utilized the $75,000 in the company's business and placed the remaining funds in the Coleman Moving Services, Inc. account in order to make good that company's previously issued checks to FNB in payment of the original debt to FNB. The debtor states that FNB was fully aware of the entire transaction including the fact that only $75,000 in new cash was accruing to American Properties' benefit with the remainder actually going to Coleman Moving Services, Inc. for retirement of its debt to FNB. FNB denies precise knowledge of what the debtor did with the money which FNB claims was loaned strictly to American Properties. In any event, the debtor stated through the testimony of James Coleman that at the time of the transaction with FNB its assets at going concern value probably exceeded its debts.

The FWB apparently possessed a mortgage junior to FNB with a balance of $102,000 owed. Though the complaint herein was filed on September 11, 1980, the final date for filing claims was September 9, 1980 and FWB's claim, filed on September 8, 1980 does not claim a real property mortgage. FWB in a separate proceeding has announced it makes no claim against the real property but only against corporate receivables.

Real property taxes payable to the office of the Shawnee County Treasurer are due and unpaid for the following years: 1977—$1,265.28; 1978—$2,574.41 and 1979—$2,478.46. These unpaid taxes constitute a lien on the premises in question.

A mechanics lien in the amount of $4,281 was filed against the property in July, 1980. This lien is a result of apparent non-payment for work completed on the fire damaged portion of the premises. The fire which destroyed portions of the premises occurred in January of 1979.

TBT produced an appraisal concluding that the value of the premise was $275,000 and that the proper valuation basis was the income approach. The same appraisal shows value by the market approach to be $285,000 and by the cost approach $300,000. The debtor introduced an appraisal from the file of FNB utilizing market approach and valuing the premise at $390,000 assuming replacement of the burned areas in workmanlike manner with quality products. The appraisal broke out the land as having the value $72,500 and the building and improvements having the value of $317,500. TBT's appraiser recited a $74,800 value for the land. The debtor, through its president, stated the value of the property to be $300,000 in its present condition and $400,000 repaired. The debtor indicated that its scheduled properties were valued at distress sale values which the debtor indicated were 60% of actual value. The value in debtor's schedules for this property is $180,000.

## CONCLUSIONS OF LAW

On the date of the Chapter 11 filing the real property was encumbered by a number of mortgages and by real property taxes. Subsequent to the Chapter 11 filing, a mechanics lien was filed and now creates an additional lien on the property. This type of lien is ordinarily subservient to the existing mortgages and for the purpose of this discussion will be so considered. The mechanics lien claimant is not a party to this proceeding and thus nothing herein should preclude that claimant's right to litigate its claim at a later date.

The unpaid real property taxes impair on a dollar for dollar basis the banks' claims

and thus will be deducted from the actual value of the premises prior to determining its value to the mortgage holders.

FWB no longer claims to be secured by a mortgage against the premises and will thus be deleted from further consideration in this decision.

The real property in question is currently owner occupied. Assuming a continuation of that type of occupancy, the market approach would seem a reasonable method of valuation. The evidence pertaining to that approach is that the premises is worth in its present state $285,000 or $300,000. Repaired, the premises value is stated to be $390,000 to $400,000. The Court concludes that the current value of the premises is $300,000. From that $300,000 valuation figure the delinquent 1977–79 real property taxes are deducted leaving a rounded value available to the three banks and the mechanics lienholder of $294,000. In addition to the property, there is presently available toward payment of TBT's mortgage note the sum of $37,046.72. In round figures TBT is owed $105,000, USB $45,000 and FNB $212,000 for a total of $362,000. FNB is thus unsecured by approximately $31,000. The mechanics lienholder is also unsecured.

Should the property be repaired through utilization of the $37,000 held by TBT, plus an additional $19,000 available from the fire insurance carrier plus an additional sum of money generated by the business of the debtor of some $16,000, the property would, in accord with the valuation estimates of record, be valued at approximately $390,-000. Assuming the value would increase by a minimum dollar for dollar on funds expended, the value would be $366,000 which is less than the estimates supplied to the Court. Thus, if the facility were rebuilt, FNB and the mechanics lienholder should be fully secured on the basis of the evidence presented.

Relief from stay is granted pursuant to 11 U.S.C. § 362(d)(1)

*for cause, including the lack of adequate protection of an interest in property of such party in interest; or*

*(2) with respect to a stay of an act against property if—*

*(A) the debtor does not have an equity in such property; and*

*(B) such property is not necessary to an effective reorganization.*

As to subsection (d)(2)(A) and (B) of § 362, the debtor has been shown not to have an equity in the property but the Court cannot find from the evidence that the property is unnecessary to an effective reorganization. No testimony adduced would indicate this and in fact the testimony leads the Court to conclude that the property is part of and necessary to the debtor's overall plan of reorganization.

As to subsection (d)(1) of § 362, adequate protection has not been requested until now and if adequate protection pursuant to this decision is not provided the creditors, they would be entitled to the relief sought.

As pointed out in *Matter of Aurora Cord and Cable Co.*, Bkrtcy., 2 B.R. 342, 1 CBC2d 486, when considering adequate protection the concern for secured creditors must be balanced against public policy favoring and encouraging successful reorganization. Both TBT and USB have fully secured claims. The balance due them respectively is $105,000 and $45,000. The total amount of $150,000 due is secured by property presently worth $294,000 and an additional $37,000 in cash held by TBT. These two creditors have a substantial cushion and are, pursuant to 11 U.S.C. § 506(b), entitled to interest on their claims. Adequate protection for them is allowance of the accumulation of interest at their contract rates on a monthly basis. See *In re Rogers Dev. Corp. et al.*, Bkrtcy., 2 B.R. 485, 1 CBC2d 499.

FNB has a secured claim in the amount of $181,000 and an unsecured claim in the amount of $31,000. FNB's secured claim is not presently entitled to interest pursuant to § 506(b) and its unsecured claim need not be considered at this juncture. FNB is in need of adequate protection. As the claims of TBT and USB accumulate interest, the security of FNB is diminished in equal proportion to the interest

accumulations. Thus, in order to meet the requirement of adequate protection as set forth in 11 U.S.C. § 361(1), the debtor must pay FNB on a monthly basis the decrease in value of its security interest, i. e. the contract interest due on the notes held by TBT and USB.

The compensation to be paid FNB would be computed in the following manner. TBT is owed $104,806.00 at a contractual interest rate of 8%. TBT currently has on deposit in a non-interest bearing account $37,046.72. That balance offsets a like amount of debt, therefore TBT's portion of the secured collateral grows at 8% of $67,759.28 per year, which is $5,420.74. Alternatively, TBT may accumulate interest on the full $104,806.00 at 8%; however, should this alternative be chosen, the Court will require TBT to place the $37,046.72 in a certificate bearing the going rate for 90 day periods. USB is owed $44,815.10 at 10% per annum, thus its portion of the secured collateral grows at $4,481.51 per year. In order that FNB be provided adequate protection pursuant to § 361(1), FNB must receive from the debtor $9,902.25 per year or $825.19 per month so long as a change in circumstances does not dictate a renewed complaint or until confirmation or dismissal. See *In re Pitts*, Bkrtcy., 2 B.R. 476.

The secondary issues previously mentioned are resolved as follows.

■ The Court concludes that marshalling is inappropriate as TBT does not actually have two sources of collateral, one of which is unavailable to other secured creditors. The fund consisting of insurance proceeds can only be used for the benefit of all parties, i. e. to retirement of TBT's mortgage or for reconstruction of the premises which increases its value for the benefit of all mortgagees. Essentially the insurance proceeds were generated by a fire which caused a loss in value to the building and thus to mortgagees, by reconstruction the building should be restored to the same value to mortgagees as prior to the fire. This, of course, is what a junior mortgagee bargains for, the building value, not a fire loss. The fire loss fund which was originally $52,686.11 has been used to the extent of $15,639.39 for clean up and improvement to the premises subsequent to the fire. From the standpoint of value to the debtor and all lien creditors involved, reconstruction with utilization of $19,000 in additional insurance proceeds available only if reconstruction occurs, and the debtors own funds is of the greatest benefit to all. Reconstruction may well fully secure all the creditors. Without reconstruction, a loss to two of the creditors is certain. The Court therefore concludes that the debtor either with agreement of the three mortgage creditors or as a result of confirmation of its plan may utilize the funds on deposit with TBT, combined with the additional insurance proceeds and its own funds, as necessary and as permitted, to complete reconstruction of the premises. If the funds are not so used, then the deposited funds are to be applied toward reduction of debt to TBT.

The Court further concludes that the meager evidence on voidable preference presented during the proceeding, which consisted primarily of James Coleman's testimony, is insufficient to deny granting of FNB's request for adequate protection at this time and in this adversary proceeding.

The Court further concludes that the debtor must retire at a minimum the oldest real property delinquency as new taxes become due and payable in order to maintain the status quo existent on March 5, 1980.

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 752 and Rule 52(a) of the Federal Rules of Civil Procedure.