In re LOVERIDGE MACHINE & TOOL COMPANY, INC., Debtor.

In re Dennis Thorup LOVERIDGE and Marsha Ann Loveridge, Debtors.

In re Ralph S. LOVERIDGE and Betty T. Loveridge, Debtors.

In re Kent H. LOVERIDGE and Vicky A. Loveridge, Debtors.

In re Ralph Dale LOVERIDGE and Linda Loveridge, Debtors.

Bankruptcy Nos. 83C–00071, 83C–00315, 83C–00313, 83C–00312 and 83C–00238.

United States Bankruptcy Court, D. Utah.

Dec. 13, 1983.

Rulon T. Burton, Burton & Schiess, Salt Lake City, Utah, for debtor Loveridge Machine & Tool Co., Inc.

Matthew F. Hilton, Salt Lake City, Utah, for debtors Dennis Thorup Loveridge, Marsha Ann Loveridge, Ralph S. Loveridge, Betty T. Loveridge, Kent H. Loveridge, Vicky A. Loveridge, Ralph Dale Loveridge, and Linda Loveridge, Glen E. Davies, Watkiss & Campbell, Salt Lake City, Utah, for Northwest Acceptance Corp.

## MEMORANDUM OPINION ON CONFIRMATION OF CHAPTER 11 PLAN AND INTEREST RATES UNDER 11 U.S.C. §§ 506(b) and 1129(b)

GLEN E. CLARK, Bankruptcy Judge.

### FACTUAL AND PROCEDURAL BACKGROUND

Debtors' Chapter 11 plan covers, for administrative purposes only, the five Chapter 11 cases of members of the Loveridge family and of their corporate business. Thus there are, in effect, five plans. After several hearings on the confirmation of various versions of the plans proposed by debtors, the issues narrowed as debtors modified their plans to secure favorable votes. The Code's requirements relating to notice and a hearing have been satisfied with respect to each modification.

At the hearing on confirmation held on October 18, 1983, debtors had satisfied most of the requirements of 11 U.S.C. § 1129(a) with respect to each of the five plans. Class F–4, composed of the unsecured claims against debtors Kent H. and Vicky A. Loveridge, did not accept the plan as required by 11 U.S.C. § 1126(c). Class B–1, composed of the allowed secured claim of Northwest Acceptance Corporation (Northwest), likewise did not accept the plan. Both classes are impaired under 11 U.S.C. § 1124.

Northwest and debtors were unable to agree on two legal issues: first, the appropriate rate of interest to be added to Northwest's allowed secured claim under 11 U.S.C. § 506(b), and second, the appropriate rate of interest to be added to Northwest's allowed secured claim under 11 U.S.C. § 1129(b).

No member of Class F–4 appeared at the confirmation hearing or filed any objection

to confirmation. The sole votes in Class F–4 and Class B–1 were against the plan.

Having received briefs and heard the helpful arguments of counsel, the court now files this memorandum opinion.

## CONFIRMATION OF THE PLAN OVER THE OBJECTION OF NORTHWEST ACCEPTANCE CORPORATION

1. *The Appropriate Interest Rate Under 11 U.S.C. § 506(b)*

Section 506(b) provides that:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.

The parties agree that Northwest holds an allowed secured claim secured by property the value of which is greater than the amount of Northwest's claim. Debtors do not seek to recover costs or expenses under Section 506(c).[1] The agreement under which Northwest's claim arose provides for annual interest at the rate of 19 percent.[2] Debtors' plan proposes the following treatment of Northwest relative to Section 506(b):

The holder of this claim [Northwest] shall receive on account of its Allowed Secured Claim and allowed attorney fees and costs, interest from the Petition Date to the Effective Date at the Legal Rate as defined by 28 U.S.C. Section 1961 which was in effect as of the Petition Date.

28 U.S.C. § 1961(a), as amended effective October 1, 1982, provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." The interest rate on such judgments is to be calculated

from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.

The Director of the Administrative Office of the United States Courts distributes notice of the prevailing rate and any changes in it to all federal judges. Debtors' plan defines the term "petition date" as the date on which the corporate debtor filed its petition, January 10, 1983. The applicable interest rate under Section 1961 on January 10, 1983 was 8.75 percent.

In my view, Section 506(b) requires, whenever post-petition interest is to be added to an allowed secured claim, interest at the lawful contract rate if there is a contract providing for interest. The parties have made a considerable effort to explain

[1] Thus, the court is not called upon to decide whether post-petition interest on oversecured claims may be allowed before confirmation of a plan or disposition of the collateral or any of the other timing issues which might be raised by a requested recovery under Section 506(c). *See* O'Toole, "Adequate Protection and Post-Petition Interest in Chapter 11 Proceedings," 56 AM.BANK.L.J. 251 (1982). Likewise, the court is not required to decide in this case whether the right, if any, to post-petition interest is entitled to adequate protection. "The question of oversecured claims, post-petition interest, and adequate protection has never been answered in this district." *In re South Village, Inc.,* 25 B.R. 987, 995 n. 10 (Bkrtcy.D.Utah 1982). Moreover, the parties have not raised the issue of whether interest should accrue under Section 506(b) on the principal amount of the debt plus pre-petition interest only or, in addition, on allowable post-petition costs and

fees. This plan appears to provide for post-petition interest on principal, pre-petition interest, and pre- and post-petition costs and fees. Finally, there appear to be no junior lien holders on Northwest's collateral. Thus, issues such as those raised in *Wolohan Lumber Co. v. Robbins,* 21 B.R. 747 (Bkrtcy.S.D.Ohio 1982) are not before the court.

[2] The parties have not indicated whether this interest rate was the non-default rate of interest or the default rate of interest. Thus, the court is not asked to rule on the question of the allowability of default rates under Section 506(b). *See* Baylor, "After Bankruptcy Lets the Curtain Fall: Are Claims in Reorganization Proceedings for Post-Petition Interest at Higher 'Default Rates' Consigned to Universal Darkness?" 86 COM.L.J. 221 (1981).

the grammatical structure of Section 506(b) and the meaning of the placement of the comma after the phrase "interest on such claim." Northwest, for example, argues that the placement of the comma means what Collier says it might mean:

[The placement of the comma] apparently derived from the need the drafters felt to make clear that interest was to be allowed only to the extent it accrued on the claim (as opposed to any other amount).

3 COLLIER ON BANKRUPTCY ¶ 506.05 at 506–36 (15th ed. 1983). Debtors, on the other hand, invoke doctrines of statutory construction in support of their position that the phrase "provided under the agreement under which such claim arose" in Section 506(b) modifies only the terms "reasonable fees, costs or charges" and not the phrase "interest on such claim." [3]

■ These arguments are interesting but unnecessary to reach an understanding of Section 506(b). Section 506(b) treats interest, costs, and charges on "an allowed secured claim." An allowed secured claim may arise not only from a contract, but also from a non-contractual obligation which has become a lien on property. An allowed secured claim under Section 506(a) might arise, for example, from a tax lien or a judgment lien based on a tort liability. *See In re Busman,* 5 B.R. 332, 338 (Bkrtcy.E.D. N.Y.1980) (recognizing that post-petition interest should be added to an oversecured judgment lien under Section 506(b)); *In re Bormes,* 14 B.R. 895 (Bkrtcy.D.S.D.1981) (recognizing that post-petition interest should be added to an oversecured judgment lien under Section 506(b)).

Because allowed secured claims may arise either from contractual or noncontractual obligations, Section 506(b), when it provides for interest on allowed secured claims, does not specify that interest will accrue at the contract rate. The language of Section 506(b) "requires only that the oversecured creditor receive *some* rate of interest. It doesn't require that it receive the contract rate of interest, although it does require that the contract determine the allowable expenses and costs." *In re Brooks,* 24 B.R. 447, 449 (Bkrtcy.D.Kan.1982) (emphasis in original). *Accord* 1 NORTON BANKR.L. & PRAC. § 28.25 n. 1 at 176 (Supp. Oct. 1983). For many allowed secured claims, there will be no contractual rate of interest. Thus, when the drafters of Section 506(b) provided for interest on oversecured claims, they did not designate a governing interest rate. [4]

■ Viewed in this way, Section 506(b) makes sense. If there is an agreement providing for fees, costs, or charges, then, subject to the other limitations on the applicability of Section 506(b),

there shall be allowed to the holder of [an allowed secured claim] ... any reasonable fees, costs, or charges provided under the agreement under which such claim arose.

If there is no agreement, then fees, costs, and charges are not allowable. But whether the claim arises from a contract or not, interest is to be added to allowed oversecured claims.

■ Recognizing this, however, does not answer the question of the appropriate interest rate to be applied under Section 506(b). An interest rate should not be chosen by juggling rules of grammar. Neither should the selection of an interest rate be influenced by favoritism of debtors over creditors, creditors over debtors, or of some creditors over others. Using the lawful contract rate where there is a contract avoids such errors and provides a rule which is easily applied and consistent with authority and reason.

Using any interest rate other than the contract rate, where there is a contract,

---

**3.** *Accord,* O'Toole, *supra* note 1, at 275 n. 65.

**4.** Some have argued from the House and Senate Reports on Section 506(b) that its provision for interest was meant to codify existing case law. A close reading of these reports, however, shows that the statements made about codifying current law relate not to interest but to fees, costs, and charges. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 356–357 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 68 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

would produce irrational results. To measure the reasonable fees, costs, and charges to be added to an allowed oversecured claim based on a contract, the court would look to the contract. But to measure the interest to be added to the same claim, the court would look outside the contract. Why should bankruptcy law enforce the parties' bargain with respect to fees, costs, and charges but not enforce it with respect to interest?[5] Moreover, as Northwest's counsel points out, rejecting the contract rate where there is a contract might mean either a windfall to the creditor when the contract rate is less than the rate selected or a windfall to the debtor when the contract rate exceeds the rate selected. Given the volatility of interest rates, the contract rate will often differ from the prevailing market rate at the time of the hearing. The parties in this case have shown no good reason for producing a windfall under Section 506(b).

Debtors agree with the results and reasoning of *In re Minguey,* 10 B.R. 806 (Bkrtcy.W.D.Wis.1981) and *In re Marx,* 11 B.R. 819 (Bkrtcy.S.D.Ohio 1981). *See also In re Anderson,* 28 B.R. 628 (D.C.S.D.Ohio 1982) (district court opinion agreeing with *Marx* without analysis). *Minguey* and *Marx* begin by drawing the reasonable conclusion that the phrase "provided under the agreement under which such claim arose" in Section 506(b) does not modify the word "interest." As explained above, that conclusion follows from recognizing that allowed secured claims may be based either on contractual or noncontractual obligations. *Minguey* and *Marx,* however, used other explanations and, in the process, concluded that even where there is a contract rate of interest, that rate should not be used under Section 506(b).

Both *Marx* and *Minguey* have been criticized. Collier, for example, says that:

> In each of these cases, the bankruptcy judges improperly attempted to apply section 506(b) to determine the appropri-

ate interest rate to be paid on secured indebtedness under a chapter 13 plan. In one of these cases [*Minguey*], the plan proposed to pay the entire indebtedness in 36 equal monthly installments, and thus the interest rate sought was that necessary to provide a value as of the effective date of the plan equal to the allowed amount of the secured claim. However, the appropriate rate for such purpose is determined by application of section 1325(a)(5)(B)(ii) ... and is the discount rate which the court determines under the circumstances ... best reflects the present value of the payments proposed to be made to the holder of the subject secured claim under the chapter 13 plan. Section 506(b) has no application in this context. Therefore, it is not surprising that in attempting to apply section 506(b) in this context, the court strained to achieve a result which permits the use of a rate determined by the court to be more appropriate under the circumstances. Indeed, in the same decision the court appears to have allowed interest accrued at the contract rate up to the date of filing of the proof of claim. Most courts have not referred to section 506(b) in considering proposed interest rates in the section 1325(a)(5) context.

.    .    .    .    .

In the other case [*Marx*], the plan proposed to pay the arrearages on the secured indebtedness upon confirmation and the remaining installments currently in accordance with the terms of the applicable mortgage pursuant to section 1322(b)(5). The court considered section 506(b) to determine the amount of interest to be paid on such arrearages until the date of payment. Since the payment was apparently to be made on the effective date of the plan (or shortly thereafter), the court was correct in looking to section 506(b), as opposed to section 1325(a)(5)(B)(ii) which would govern the accrual of interest after the effective

---

**5.** In some cases a distinction between interest and costs or charges may be difficult to make.

*See* Baylor, *supra* note 2 at 223.

date of the plan. However, in attempting to construe the grammatical ambiguity of section 506(b), the court looked to, among other things, (a) section 726(a)(5), which provides for the payment in a chapter 7 case of post-petition interest at the legal rate by a solvent estate to unsecured creditors, (b) pre-Code decisions discussing the role of equitable considerations in the allowance of interest and (c) several decisions regarding the applicable rate of interest on installments under section 1325(a)(5)(B)(ii) (i.e., thus effectuating the converse of the error described in the preceding paragraph.) That the wrong interpretation was reached is, therefore, not surprising.

COLLIER, *supra*, ¶ 506.05 at 506–37 to 506–39. Another commentator says that *Minguey* is wrong because

[Although] the court felt 'compelled' to [reach its conclusion] . . . because a contrary construction would reach a decision contrary to that reached by the Supreme Court in *Vanston Bondholders Protect. Comm. v. Green,* 329 U.S. [156] 159 [67 S.Ct. 237, 238, 91 L.Ed. 162] (1946)[,] Vanston dealt with a claim which included postpetition interest on unpaid interest, not with postpetition interest on the unpaid principal as contemplated by § 506(b). Thus, interpreting § 506(b) as requiring contractual interest be provided the over-secured creditor is not inconsistent with Vanston. Moreover, Vanston has to an extent been overruled by the present value provisions of § 1325(a)(5)(B)(ii) which in effect requires that interest, beginning on the effective date of the plan, be paid on unpaid interest that had matured at the time of the petition.

．　　　．　　　．　　　．　　　．

The court in *Minguey,* in misconstruing the relationship between §§ 506(b) and 1325(a)(5)(B)(ii), also effectively rendered § 506(b) a nullity in the context of a Chapter 13 plan. The court read § 506(b) as requiring the over-secured creditor to

be paid a reasonable rate of interest during the life of the plan. Independently of § 506(b), all secured creditors are entitled to interest beginning on the effective date of the plan through the operation of § 1325(a)(5)(B)(ii). Ignoring this misconstruction, the result in Minguey means the court would allow the over-secured creditor interest from the time of the petition until the effective date of the plan at the rate determined under § 1325(a)(5)(B)(ii).

Kennedy, "Cramdown of the Secured Creditor Under Chapter 13 of the Bankruptcy Code," 1982 ANN.SURV.BANKR.L. 253, 281–282 n. 79.1.

The same commentator also criticizes *Marx:*

The court's reliance on § 726(a)(5) as supporting its construction of § 506(b) seems misplaced. The language of § 726(a)(5) implies a construction opposite that made by the court in Marx. Since § 726(a)(5) expressly requires the payment of interest at the legal rate, the omission in § 506(b) of any reference to the legal rate, coupled with the "provided under the agreement" language immediately following the provision for interest in § 506(b), suggest strongly that the legislative intention was that interest under 506(b) is to be at the contractual rate.

*Id.* at 282. These criticisms are persuasive. Relying on *Marx*'s attempt to apply Section 726(a)(5) to give meaning to Section 506(b), debtors argue that the appropriate rate of interest under Section 506(b) is the legal rate. As noted by the commentators just quoted, however, Section 726(a)(5) does not support the conclusion reached in *Marx.* Moreover, even if the "legal rate" of interest is the appropriate rate to be applied under Section 506(b), that term is not defined by the Bankruptcy Code and may well mean the contract rate of interest where there is a contract.[6] *See* Fortgang and King, "The 1978 Bankruptcy Code: Some Wrong Policy Decisions," 56 N.Y.U.L. Rev. 1148, 1151–1153 (1981).

---

**6.** Thus, debtors' arguments relating to 28 U.S.C. § 1961(a), namely, that if Section 506(b) interest is interest at the legal rate then 28 U.S.C. § 1961(a) controls, are not compelling.

The overwhelming majority of courts which have interpreted or applied Section 506(b)'s provision for interest have held or assumed that the contract rate of interest would apply where there is a contract. *See In re American Metals Corp.,* 31 B.R. 229 (Bkrtcy.D.Kan.1983); *In re Langley,* 30 B.R. 595 (Bkrtcy.N.D.Ind.1983); *In re Rutherford,* 28 B.R. 899 (Bkrtcy.N.D.Ill.1983); *In re Masnorth Corp.,* 28 B.R. 892 (Bkrtcy.N.D. Ga.1983); *In re Anderson,* 28 B.R. 231 (Bkrtcy.N.D.Ga.1983); *In re Redeker,* 27 B.R. 734 (Bkrtcy.D.Kan.1983); *In re Elmwood Farm, Inc.,* 19 B.R. 338 (Bkrtcy.S.D.N. Y.1982); *In re McLean,* 17 B.R. 1 (Bkrtcy. W.D.Mo.1981); *In re Dye Master Realty, Inc.,* 15 B.R. 932 (Bkrtcy.W.D.N.C.1981); *In re Davis,* 14 B.R. 226 (Bkrtcy.D.Me.1981); *In re Holl,* 13 B.R. 918 (Bkrtcy.D.Haw. 1981); *In re Caudle,* 13 B.R. 29 (Bkrtcy.W. D.Tenn.1981); *In re Eastern Equipment Co.,* 11 B.R. 732 (Bkrtcy.S.D.W.Va.1981); *In re American Properties, Inc.,* 8 B.R. 68 (Bkrtcy.D.Kan.1980); *In re Bagley,* 6 B.R. 387 (Bkrtcy.N.D.Ga.1980); *In re Smith,* 4 B.R. 12 (Bkrtcy.E.D.N.Y.1980). Only *Marx* and *Minguey* hold to the contrary.

Collier's opinion is that "postpetition interest [under Section 506(b)] should be computed at the rate provided in the agreement under which the claim arose, the so-called 'contract rate' of interest. . . . this result appears consistent with prior case law." COLLIER, *supra* at 506–36 to 506–37 (citing cases) *Accord,* 3 COLLIER BANKR.PRACT. GUIDE ¶ 52.17 at 52–28 (1983) ("[I]nterest on [an oversecured claim] is recoverable from the excess collateral at the rate chargeable under the security agreement."); Blum, "Treatment of Interest on Debtor Obligations in Reorganizations Under the Bankruptcy Code," 50 U.CHI.L.REV. 430, 432 n. 9 (1983) ("The Code still allows interest on secured obligations, at the contract rate, up to the value of the collateral. 11 U.S.C. § 506(b)"). *See also* Fortgang and King, *supra* at 1152 n. 18 ("Courts under the Old Act routinely awarded postpetition interest at the contract rate in appropriate cases.")

Based on these authorities, and for the reasons already explained, Northwest's allowed secured claim will bear interest, if debtors' plan is confirmed, at the contract rate, 19 percent per annum, between January 10, 1983 and the effective date of debtors' plan.

2. *The Appropriate Interest Rate Under 11 U.S.C. § 1129(b)*

■ Section 1129(b) provides that debtors' plan may be confirmed notwithstanding Northwest's failure to accept it only "if the plan does not discriminate unfairly, and is fair and equitable" with respect to Northwest.

Northwest holds an allowed secured claim in the approximate amount of $448,807.00. Northwest's collateral is principally equipment and, in addition, some inventory and accounts receivable. Northwest's claim arises from a contract made in August 1982, only five months before the corporate debtor filed its petition for relief and within six months of the filings of the individual debtors. The original contract term was four years. Payments were to begin on October 1, 1982. The contractual interest rate was 19 percent per annum. The individual debtors had guaranteed payment under the contract. As noted above, the parties agree that at least as of the date of the last confirmation hearing the value of the collateral exceeded the amount of Northwest's claim.

Evidence introduced in this case indicates that some of the equipment securing Northwest's loan will appreciate for a time, that some will retain its value over the next three to five years, and that some is depreciating now. Over the extended payout period proposed by the plan, the equipment will depreciate more than it would have depreciated over the original contract term. The evidence does not show whether payments under the plan will equal or exceed depreciation of the collateral.

Debtors' plan proposes to pay Northwest the full amount of its allowed secured claim plus allowed legal fees and costs. Debtors stipulate that Northwest will receive postpetition interest at whatever rate the court

determines to be the appropriate rate under Section 506(b). Under the plan, Northwest will retain its lien on all of its collateral.[7] In settlement of adequate protection questions, the parties stipulated earlier in the case that certain levels of inventory and accounts receivable would adequately protect Northwest's interest. The plan provides that these levels will be maintained and that the debtor will continue to provide periodic reports to Northwest in accordance with the settlement. The plan will extend the original four year term of the contract by an additional two to three years, depending on the rates of interest to be paid Northwest. The plan continues the personal guarantees of the individual debtors. Collateral required to be insured under the contract will continue to be insured. Payments to Northwest will be made by the corporate debtor starting on the effective date of the plan in 12 monthly payments of $7,400.00 each; thereafter, payments of $9,400.00 each until and including August 1986; and thereafter, monthly payments of $12,000.00 each starting October 1986 until interest and principal have been paid.

Northwest accepts all of these terms of the plan. Northwest's rejection of the plan is based on the plan's provisions for post-effective date interest on Northwest's allowed secured claim. Under the plan, interest on Northwest's claim from the effective date forward is to be

the Legal Rate as defined by 28 U.S.C. Section 1961, which is in effect on the Effective Date so that the holder of said claim will receive the "present value" of its [claim.]

The plan defines the term "effective date" as follows:

Effective date shall mean the date thirty (30) days after the date upon which the Order of Confirmation is no longer subject to appeal or certiorari proceedings, on which date no such appeal or certiorari proceeding is then pending and on which date all of the conditions to the effectiveness of the Plan expressly set forth in the

Plan have been satisfied fully or effectively waived.

This definition, coupled with the plan's provision for post-effective date interest, makes it difficult to determine the actual proposed rate of interest. The interest rate fixed under 28 U.S.C. § 1961(a) changes monthly. For example, during 1983 the interest rates fixed under Section 1961(a) have been, to date, as low as 8.65 percent and as high as 10.74 percent. Given these variations, it is likely that the interest rate may change in the coming months. The court is unable to determine exactly what interest rate would apply to Northwest's claim. If the court confirms the plan today, the effective date of the plan will not occur any sooner than 30 days later even if there is no appeal and even if all conditions to the plan's effectiveness have been satisfied. If there is an appeal, there is no way to tell when the effective date might actually be. An appeal of this matter could delay the effective date for months or years.

In *In re Connecticut Aerosols, Inc.,* 31 B.R. 883 (Bkrtcy.D.Conn.1983), the bankruptcy court confirmed a Chapter 11 plan which provided that the effective date of the plan would be:

[t]he first business day following the last day on which an appeal from an Order of the Court confirming this Plan may be taken or if such an appeal has been taken, the first business day following the date upon which such appeal has been exhausted and the Plan may proceed.

The order of confirmation was appealed. While the appeal was pending, the parties brought before the bankruptcy court the issue of the appropriate interest rate to be paid under the plan. The court found that, given the plan's definition of the term "effective date," the plain intent of the plan was to delay the effective date until any appeal had been resolved. Accordingly, the court ruled that it could not fix the interest rate as required under Section 1129(a)(9)(C), the relevant section in that case, but that it would nevertheless rule on the proper stan-

7. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(I).

dard to be employed if and when a plan became effective.

Having a confirmed plan of reorganization which has not yet had its "effective date" is troublesome. This court has explored elsewhere some of the difficulties involved in defining the term "effective date." *See In re Jones,* 32 B.R. 951, 958 n. 13; CCH Bankr.L.Rep. ¶ 69,374 at 83,149 n. 13 (Bkrtcy.D.Utah 1983). The "effective date of the plan" is the critical point for the major financial standards for confirmation under Sections 1129(a)(7), 1129(a)(9) and 1129(b). The valuations required by these sections must be based on findings of fact which are likely to be less accurate if the effective date is not close to the date of the hearing on confirmation, where the evidence is presented. The application of Section 1129(b) to a plan which delays its effective date until after the resolution of any possible appeals may be illusory and, therefore, the confirmation of a plan using an illusive definition of the term "effective date" may be so speculative as to be meaningless. On the other hand, if the only issue at confirmation is the propriety of a given method of calculating an interest rate under Section 1129(b) and if other confirmation standards have been satisfied no matter which method is ultimately selected, a definition like the one used in this case may be permissible.

The arguments of the parties appear to have narrowed the dispute under Section 1129(b) to the following issue: Is the interest rate fixed by 28 U.S.C. § 1961(a), whatever that rate may be on the effective date of this plan, whenever that might be, a proper interest rate for discounting the deferred cash payments to Northwest under the plan to their present value as of the future effective date of the plan? The parties have assumed, and their assumption seems reasonable, that on the effective date of this plan, if it is confirmed, the prevailing interest rate under 28 U.S.C. § 1961(a) will be significantly lower than the interest rate provided for in Northwest's contract. If the effective date of this plan were today, for example, the interest rate under Section 1961(a) would be 9.98 percent per annum, almost one-half the contract rate of 19 percent.

Debtors argue for the rate set by 28 U.S.C. § 1961(a) based on recent bankruptcy court opinions which have used that statute in fixing a discount rate for deferred cash payments under Chapter 11 or 13 plans. *See, e.g., In re Connecticut Aerosols, Inc., supra; In re Fisher,* 29 B.R. 542 (Bkrtcy.D.Kan.1983); *In re Jewell,* 25 B.R. 44 (Bkrtcy.D.Kan.1982); *In re Tacoma Recycling,* 23 B.R. 547 (Bkrtcy.D.Wash.1981).

None of those cases, however, is controlling in this case. Each should be distinguished on its facts and law. The two Chapter 11 cases, *Connecticut Aerosols* and *Tacoma Recycling,* involved unsecured priority federal tax claims. In *Connecticut Aerosols,* the plan proposed to pay the claim over time in deferred cash payments. The parties agreed that interest should be added but disagreed on the rate. The IRS proposed the rate established by 26 U.S.C. § 6621 for delinquent tax debts. The debtor proposed the rate set by 28 U.S.C. § 1961(a). The parties submitted no evidence. The court made a limited holding that the rate set by 28 U.S.C. § 1961(a) is better than the rate set by 26 U.S.C. § 6621 for discounting deferred cash payments on unsecured priority tax claims to present value where there is no other evidence because 28 U.S.C. § 1961(a) is more closely tied to current economic conditions at the time of confirmation. *Connecticut Aerosols* has little relevance to this case. Here, the claim is based on a contract not a tax liability. Here, the court is not asked to decide whether 28 U.S.C. § 1961(a) is better than 26 U.S.C. § 6621 for selecting an interest rate for unsecured priority tax claims. Here, the claim is secured, not unsecured. Here, the parties have submitted evidence on the interest rate issue.

In *Tacoma Recycling,* the plan proposed an arbitrary 10 percent interest rate. The IRS argued for the rate set by 26 U.S.C. § 6621. The debtor argued that if the 10 percent rate was insufficient, then the court should not set a rate higher than the 52-

week Treasury Bill rate. Apparently, no evidence was taken. The court rejected both the 10 percent rate and the IRS's proposed rate because, when compared to "the current money market" neither was "responsive to current economic conditions prevailing on or about the date of confirmation." 23 B.R. at 549. The court selected the rate set by 28 U.S.C. § 1961(a) because it "is more closely tied to current economic conditions." 23 B.R. at 550. *Tacoma Recycling* should be distinguished from the present case. Its statements on the proper rate of interest on an unsecured priority tax claim have little bearing on the facts of this case.

*Fisher* and *Jewell* are Chapter 13 opinions. In *In re Nite Lite Inns,* 17 B.R. 367, 372 (Bkrtcy.S.D.Cal.1982), a Chapter 11 case, the court said that "[t]he majority of the cases on the subject [of selecting an interest rate for discounting deferred cash payments to present value] are rendered in the Chapter 13 context; however, the relevant considerations are substantially similar to those in Chapter 11 cases." Accord *In re Benford,* 14 B.R. 157, 159, 160 (Bkrtcy.W.D. Ky.1981); Blum, *supra* at 441 n. 49. Cases interpreting Section 1325(a)(5)(B)(ii)'s present value requirement, however, should not be given undue weight in interpreting the present value requirement of Section 1129(b). Section 1325, unlike Section 1129(b)(2), has no "fair and equitable rule." This unique Chapter 11 requirement may, in some cases, dictate interest rates different from those which would be applied in a pure present value analysis. In addition, Chapter 13 payments normally are collected and disbursed by a standing trustee. Chapter 11 payments are not. Chapter 13 debtors who complete their plans receive a broader discharge than individual debtors in Chapter 11. These and other factors may make the risk of nonpayment in Chapter 13 significantly different from the risk of nonpayment in Chapter 11. Moreover, most of the Chapter 13 opinions deal with creditors secured by liens on cars or tax creditors. These limited factual patterns have not presented a full range of present value issues even in the Chapter 13 context. Finally, many of the Chapter 13 opinions, and *Fisher* and *Jewell* are examples, attempt to deal with present value issues *en masse* to devise an easy rule for Chapter 13 cases because a full trial on the issue of present value in every Chapter 13 case is, as a practical matter, impossible. The volume and nature of Chapter 13 cases in general and the usually small amounts involved may justify such treatment of present value issues.[8] But methods generated in Chapter 13 cases may not be appropriate for automatic incorporation in Chapter 11 cases. The Chapter 13 opinions are not the last word on present value issues in Chapter 11 cases. Put simply, the Chapter 13 opinions should not inspire courts to avoid hard thinking about present value issues in Chapter 11 cases.

This is not to say, however, that many of the Chapter 13 opinions cannot be helpful in analyzing issues in Chapter 11 cases. *Fisher* and *Jewell* are important statements on the issues raised by discounting deferred cash payments to present value.

*Fisher* involved two Chapter 13 cases. In the first case, a 10 percent rate was applied to several claims held by the IRS solely because the IRS had failed to object to confirmation of a plan proposing a 10 percent rate. In the second case, the 8.65 percent interest rate under 28 U.S.C. § 1961(a) on the date of debtors' petition was applied to a tax claim with the addition of a one percent risk premium. The opinion does not clearly specify whether the claim was unsecured, priority, or secured, but the opinion, at 29 B.R. at 552, refers to the IRS as an "undersecured creditor." The court rejected the IRS's proposal to use the rate set by 26 U.S.C. § 6621. In dicta, the court rejected using a contract rate unadjusted for the special risks involved in a Chapter 13 proceeding. *Fisher* has little persuasive force in this case. Its analysis of the proper interest rate for tax claims has little relevance to a claim based on a contract. Moreover, its criticisms of the contract rate,

---

**8.** *But see* 3 NORTON, *supra* § 77.08 at 105

(Supp. Oct. 1983).

some of which are discussed below, are focused by a Chapter 13, not a Chapter 11, lens.

*Jewell,* an opinion covering three Chapter 13 cases, involved three creditors holding secured claims. The court found that the rate set by 28 U.S.C. § 1961(a) just prior to filing was the best rate to apply to these and all other claims in Chapter 13 cases. The court selected this rule because it "best reflects the value of money in today's market place." 25 B.R. at 46. Apparently, however, the court took no evidence other than on various other existing interest rates. The court appeared to be fixing a general interest rate to be applied to all claims in all Chapter 13 cases to be decided in the future in that district. The court's general system for fixing interest rates in Chapter 13 cases is not suitable for transplantation into this Chapter 11 case.[9]

I find, based upon the above analysis, that none of the opinions which have adopted 28 U.S.C. § 1961(a) as a proper source of a discount rate for deferred cash payments is good precedent for making a decision in this case.

Independent of this conclusion, however, is my opinion that to use 28 U.S.C. § 1961(a) as the source of the interest rate for discounting deferred cash payments to Northwest under this plan would be ill advised and erroneous as a matter of law. Although Section 1961(a) is a convenient source for interest rates and is helpful in determining the risk-free rate of interest for one year loans, this case does not involve a risk-free loan. Neither does it involve a one year loan. Government obligations to repay loans evidenced by Treasury bills are, according to the prevailing economic wisdom, among the least risky of all investments. It is to be questioned whether the short-term risk-free rate of interest is a rational, much less a "fair and equitable" rate of interest for debtors' promise to pay Northwest's debt under its plan of reorganization. It has been said that "[n]o index for short term loans . . . is a sound baseline for arriving at a fixed rate that is to govern a forced loan for a period of years." Blum, *supra* at 442. Northwest's loan will not be repaid for six to seven years. Debtors' credit standing, even if their plan is confirmed, will not in any sense be as good as those who may borrow at a risk-free rate. The parties, at the inception of Northwest's loan, calculated that a 19 percent interest rate would best measure the risks of the transaction. A rate of nearly half that rate seems inappropriate now. If debtor had shown that under its plan the risk of nonpayment of Northwest's debt is about the same as the risk of non-payment of 52-week Treasury Bills, the court might have been persuaded otherwise. No such evidence was offered. Thus, although 28 U.S.C. § 1961(a) might be a good source for an interest rate in another case, it is not an acceptable source in this case. Moreover, the propriety of using 28 U.S.C. § 1961(a) as the source of the interest rate in this case is questionable in light of current rates of interest on similar loans. An officer of Northwest testified without contradiction that a loan similar to the one proposed by this plan, similarly collateralized, and with similar terms, would require a 14 to 16 percent interest rate if made to a borrower with good credit. A loan to a borrower with debtors' post-confirmation credit would require an interest rate of approximately 20 percent.

---

**9.** A puzzling statement in *Jewell* says that an oversecured creditor whose contract rate of interest is greater than the prevailing rate under 28 U.S.C. § 1961(a) on the date of filing "can recover its contract rate of interest to the extent it is oversecured, thereafter to recover the applicable discount rate [under 28 U.S.C. § 1961(a)]." 25 B.R. at 47. The opinion does not say whether the contract rate is to be applied before or after the effective date of the plan or what it means by saying that the contract rate applies to the extent a claim is oversecured but not thereafter is uncertain. *In re Redeker,* 27 B.R. 734 (Bkrtcy.D.Kan.1983), a follow-up opinion to *Jewell,* does not clarify what *Jewell* means on this score when it says "where a creditor is owed $100,000.00, the contract calls for 18% A.P.R. interest, and the debt is secured by property valued at $125,000.00, the creditor in the Chapter 13 case would be paid its claim of $100,000.00, with the contract rate of interest as a discount rate, not on the entire claim, but only to the extent its claim is oversecured." 27 B.R. at 736.

Section 1129(b)(2)(A)(i)(II) contemplates a "present value analysis that will discount value to be received in the future." H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 412, 414–415 (1977), U.S.Code Cong. & Admin. News 1978, p. 6370; 124 Cong.Rec.H. 1104 (Sept. 28, 1978); S. 17421 (Oct. 6, 1978). This present value analysis was intended to "recogniz[e] the time-value of money." House report, *supra* at 413, U.S.Code Cong. & Admin.News 1978, p. 6369. A method for determining the time value of money is not given.

In *In re Stockdale Corporation*, Bankr. No. 81–01288, transcript of oral ruling, Mabey, J. (Bkrtcy.D.Utah June 23, 1982), the court found that the concept of the time value of money under Section 1129(b) with respect to a class of dissenting secured claims could be approached by beginning with the interest rate on risk-free investments due at the time of the completion of payments under the plan. To the applicable risk-free rate of interest, the *Stockdale* approach adds extra interest where necessary to compensate for risks imposed on secured creditors under the plan. Since secured creditors face some unavoidable risks even in the event of a liquidation, the additional interest to be added to the risk-free rate is based only on the additional risks imposed by the plan.

I find the *Stockdale* analysis persuasive for the particular facts of this case. Debtors' plan fails the first part of the *Stockdale* test because although it uses a risk-free rate of interest, that rate is based on one year obligations, not on obligations due at the time of the completion of the payments under this plan. Debtors' plan fails the second part of the *Stockdale* test because it proposes not to compensate Northwest for any of the additional risks imposed by the plan.

Having found that the interest rate debtors propose for Northwest's claim does not satisfy the present value requirement of Section 1129(b)(2)(A)(i)(II), the court's role is limited.

The court is not permitted to alter the terms of the plan. It must merely decide whether the plan complies with the requirements of section 1129(b). If so, the plan is confirmed, if not the plan is denied confirmation.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 414 (1977), U.S.Code Cong. & Admin.News 1978, p. 6370. In this case the court may only deny confirmation; "it may not rewrite the plan." *Id.* Thus, whatever the court might say with respect to interest rates not proposed by this plan would of necessity be dictum and of limited precedential value. A finding, for example, that the contract rate of interest would satisfy the present value requirements of Section 1129(b) would amount to nothing more than a finding that if the contract rate were the interest rate proposed by the plan, Northwest would accept the plan. Northwest's position has been, as shown by its brief and arguments favoring the contract rate of interest, that it would accept this plan if it proposed to pay the contract rate of interest. Therefore, there is no need to discuss whether a future plan proposing to pay the contract rate of interest would satisfy Section 1129(b)(2)(A)(i)(II) absent Northwest's acceptance.

Whether some interest rate falling between the contract rate of interest and the rate of interest under 28 U.S.C. § 1961(a) would satisfy Section 1129(b)(2)(A)(i)(II) is a question of more concern to the parties, but will only be so in the event a plan proposing such an interest rate is proposed and not accepted by Northwest. The parties have only addressed the rate proposed by this plan and the contract rate. For the court to speculate now on the appropriateness of such a rate when the parties have not had an opportunity to present evidence or submit briefs would be unfair. Moreover, although debtors presented evidence that the plan proposed is feasible if the interest rate under 28 U.S.C. § 1961(a) governs under Section 1129(b), they did not show that the plan would be feasible if the contract rate or another interest rate were used.

For these reasons, the court limits its ruling in this case to holding that the inter-

est rate proposed by the plan will not satisfy the requirements of Section 1129(b)(2)(A)(i)(II). This opinion does not support the proposition that the contract rate of interest must be used either in this plan or in any other plan proposing unaccepted treatment of secured claims. First, because Northwest would accept a plan proposing the contract rate, a holding that the contract rate is required would be dictum. Second, although a comparison of the contract rate and the rate under Section 1961(a) is helpful for analysis, nothing prevents debtors from proving that the proper rate should be less than the contract rate. Third, and without prejudice to the debtor's right to prove otherwise at any future hearing, this case presents unique facts which may give the contract rate importance which the contract rate might not have in other cases. The contract in this case was made a relatively short time before the filing of the petitions. The contract rate, as a matter of fairness and equity, may become more and more important as the time between the contract and the date of filing decreases. In addition, the evidence in this case shows that the contract rate is approximately the same as the current market rate for similar loans. Where the contract rate is not approximately the same as the current rate for similar loans, the contract rate may be of less significance.

IT IS THEREFORE ORDERED that debtors' motion for confirmation over the objection of Northwest Acceptance Corporation is denied.